GEORGE D. WIDENER, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

JOSEPH E. WIDENER, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

ELEANOR W. DIXON, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket Nos. 7723–7727. Promulgated October 8, 1927.

1. The conduct of racing and breeding stables in the circumstances *held* a business and the expenses and losses are deductible.

2. Losses and depreciation of trust estate are not pro rata deductions of the distributees of trust income.

3. In determining the taxable net income of beneficiaries under a testamentary trust, the fact that the right, at the time of death, to receive such periodic distributions of income, had a value does not serve to reduce the taxable net income embodied in such distributions. Such distributions are income both under the statute and under the Constitution.

4. Such distributions when received are not to any extent themselves the bequest so as to be exempt under section 213 (b)(3), Revenue Acts of 1918 and 1921. *Irwin* v. *Gavit*, 268 U. S. 161.

5. Death duties, whether upon the legacy or the estate, and income taxes are wholly different in concept and theory, and the fact that they may impinge upon each other in ultimate incidence by striking at the beneficiary so as to diminish first his inheritance and then his income therefrom, is a legislative matter which Congress has presumably considered.

*Schofield Andrews, Esq., J. C. Peacock, Esq., W. R. Spofford, Esq.,* and *John W. Townsend, Esq.,* for the petitioners.
*John D. Foley, Esq.,* for the respondent.

These proceedings involve deficiencies as follows:

| | | |
|---|---|---|
| George D. Widener, | 1919 | $237,264.93 |
| Joseph E. Widener, | 1919 | 264,067.06 |
| | 1920 | 69,783.52 |
| | 1921 | 75,387.10 |
| | 1922 | 29,923.56 |
| Eleanor W. Dixon, | 1919 | 188,184.19 |
| | 1921 | 26,622.70 |
| | 1922 | 17,144.68 |

The petitioners assign as errors by the respondent in determining these deficiencies, the following:

1. Failure to allow the deduction, under section 214 (a)(1) of the Revenue Acts of 1918 and 1921, as ordinary and necessary expenses of a trade or business, of expenses incurred in connection with the operation of breeding and racing stables.

2. Failure to allow the deduction, under section 214 (a) (4) of the Revenue Acts of 1918 and 1921, as losses incurred in a trade or business, of losses sustained on the sale and death of horses in connection with the operation of the stables.

3. Failure to allow the deduction, under section 214 (a) (5) of the Revenue Acts of 1918 and 1921, as losses incurred in transactions entered into for profit, of losses sustained on the sale or death of horses alleged to have been purchased for profit.

4. Failure to exclude from distributions of income received by each of the petitioners from funds held in trust, his proportionate share of the losses and depreciation sustained by the trust estate.

5. Failure to exclude from petitioners' income, in accordance with section 213 (b) (3) of the Revenue Acts of 1918 and 1921, any or all of the distributions received by them of income from funds held in trust, pursuant to the terms of certain wills.

The parties stipulated some of the facts, and the rest are found from the evidence.

### FINDINGS OF FACT.

The petitioners, Joseph E. Widener and Eleanor W. Dixon, are residents of Elkins Park, Montgomery County, Pa. The petitioner, George D. Widener, is a resident of Chestnut Hill, Philadelphia County, Pa.

During the years from 1919 to 1922, inclusive, Joseph E. Widener owned and operated horse-racing and breeding stables. He started his stables about 20 years ago, and was moved to organize them by his great interest in horses. His breeding stables were located in Kentucky and his horses in training were quartered at Belmont Park and at Elkins Park. He took an active part in the management and operation of his stables and devoted a large portion of his time thereto. He employed all riders, looked after the engagement of all horses, personally directed the breeding of the horses, kept records of the breeding, determined what horses should be purchased and sold, and otherwise engaged himself in a general supervision of the stables. Nearly every time his horses were running in races he attended the tracks where they were running. He did not bet on the races.

The employees of the stables included trainers, jockeys, blacksmiths, rubbers, exercise boys, and veterinarians. The expenses of operation included the salary and wages of such employees, feed, transportation, heat, stabling, stud fees, entrance fees, and insurance. The sources of income of the stables were purses, stakes, and the sale of horses.

The gross receipts of the stables, the ordinary and necessary expenses of operating the same, and the amounts by which the expenses exceeded the receipts, for the years involved, are:

|      | Receipts | Expenses | Deficit |
|------|----------|----------|---------|
| 1919 | $54,166.71 | $74,884.48 | $20,717.77 |
| 1920 | 70,966.71 | 177,320.90 | 106,354.19 |
| 1921 | 49,407.65 | 144,296.18 | 94,888.53 |
| 1922 | 29,601.19 | 141,464.85 | 111,863.66 |

He had purchased horses for his stables since March 1, 1913, which died or were sold at prices less than cost, as follows:

| 1919 | $40,650 |
|------|---------|
| 1920 | 18,950 |
| 1921 | 33,400 |

These amounts were made up as follows:

| Date acquired | Cost | Sold |
|---------------|------|------|
| **1919** | | |
| Gremalkin | } $15,000 | $5,000 |
| Royallieu | | |
| Tapaguer | 9,400 | 2,000 |
| Stradevaruss | 1,500 | 2,500 |
| Wynnewood | 4,000 | 250 |
| Huron | 4,000 | 500 |
| Pussy Willow | [1] 3,000 | ---------- |
| L'Infirmiere | [1] 10,000 | ---------- |
| America III | [1] 4,000 | ---------- |
| | 50,900 | 10,250 |
| **1920** | | |
| Castlereagh | 7,600 | 2,250 |
| Forward | 6,800 | 2,000 |
| NaLant | 6,100 | 4,000 |
| Lady Emmeline | 2,700 | 1,000 |
| Fayette Colt, August, 1920 | [2] 5,000 | ---------- |
| | 28,200 | 9,250 |
| **1921** | | |
| Jules Verne | 7,500 | 1,000 |
| Guelph | 4,300 | 3,500 |
| Mercury | 10,000 | 5,000 |
| Fair Gain | 14,000 | 10,100 |
| Whirlegig | 4,500 | 500 |
| Caesar | 2,700 | 800 |
| Orchid | [3] 2,300 | ---------- |
| Laskin (cost $10,000, less $1,000 charged to depreciation in 1920) | [4] 9,000 | ---------- |
| | 54,300 | 20,900 |

[1] Died; no insurance.    [2] Died Nov. 7, 1920.    [3] Died.    [4] Critically injured.

In the majority of cases the horses sold were those which had proved not to be revenue earners.

He attempted to make his stables a successful venture financially during the entire period of their operation, but with the exception of a few years at the start, they have been operated at a loss.

He was dissatisfied with the results of the operations for the years from 1919 to 1922, and reorganized his entire racing interests. He

discharged his trainer, and invested more money in the enterprise with the hope of making it a financial success. He imported a stallion from England for breeding purposes, which has returned stud fees of $110,000 in three years. As a result, 1925 and 1926 have been his best years.

This petitioner is a director in a number of corporations, and has large financial interests therein.

During 1919 George D. Widener owned and operated racing and breeding stables. He started his stables in 1916, and was moved to organize them by his fondness for horses and his interest in outdoor life. His breeding stables were located at Chestnut Hill, outside Philadelphia, and his horses in training were quartered at Belmont Park. He took an active personal part in the management of his stables. He made the entries, employed the trainer and jockey, supervised the breeding, and was generally concerned with the management of his stables. He attended the tracks where his horses were running whenever he was able to do so. He devoted more time to his stables than to his other interests.

The character of the expenses of operation and the sources of income are the same as set forth above in the case of Joseph E. Widener.

The gross receipts of this petitioner's stables for 1919 were $38,836.75, the ordinary and necessary expenses of operation were $118,346.12, an excess of expenses over receipts of $79,509.37.

He had purchased horses for his stables which were sold during 1919 for $11,455 less than cost, as follows:

| Horse | Date acquired | Cost | Sold |
|---|---|---|---|
| Pictor | 1916 | $4,000 | $2,000 |
| Abadene | 1915 | 3,000 | 2,500 |
| Mistake | 1917 | 9,600 | 645 |
| Dovecote | 1912 | 300 | 300 |
| | | 16,900 | 5,445 |

These horses were purchased for racing purposes.

He began his stables with the idea that he would come out even financially or make a profit. He was fond of horses and wanted an outdoor occupation. Each year the stables have been in operation the petitioner has sustained a loss thereon ranging from $30,000 to over $79,000. He is a director of a number of corporations.

The respondent disallowed as deductions from the income of both these petitioners the ordinary and necessary expenses of operating the stables and the losses on the sale and death of horses.

All the petitioners are beneficiaries for life under a trust created by the will of P. A. B. Widener, who died November 6, 1915.

In article fourth of the said will he directed that his mansion house should be a part of his residuary estate and should be maintained out of the income of such residuary estate as the home of his oldest living male descendant. In article fifth of his will he gave the balance of the income from his residuary estate to his descendants upon the principle of representation. Article fifth provides, *inter alia:*

FIFTH: I give, devise and bequeath all the rest, residue and remainder of my estate, real and personal, subject to the exercise of the discretion which I have vested in my son, Joseph, in the third paragraph hereof, unto my Executors hereinafter named and their successors in the Trust, and the survivors and survivor of them, In Trust, nevertheless, for the uses, persons and purposes and with the powers following:

IN TRUST, until twenty-one years after the decease of the last survivor of those of my descendants who are alive at the time of my death, as follows:—

To divide the net income monthly, into as many parts or shares as, at each time of monthly distribution, there shall be sons of mine then living and sons of mine then dead, represented by descendants then living, and to sub-divide the share falling to each set of descendants of a son of mine at any of said times dead, amongst them *per stirpes*, upon the principle of representation, and to pay over at each of said times to each of my descendants who may then be found entitled, his or her share, subject, however, to the power of appointment by Will over the income which would otherwise be payable directly to a descendant, which power I now vest in my son, Joseph, and in my grandson, George D. Widener, Jr., and in my granddaughter, Eleanore Elkins Widener Dixon, with respect to the descendants of each, namely:—

The discretion referred to as being given to his son, Joseph, relates to a collection of art and is not material to this issue. Article seventh of the said will provides:

SEVENTH: Wherever herein I have provided for the payment of income from my residuary estate to any Beneficiary, I direct that the same shall not be subject to attachment, execution, sequestration, or to any order of the Court, and that the Beneficiary shall have no power to alienate or anticipate said payments or encumber the same, nor shall said income be liable for the contracts, debts or engagements of any Beneficiary, but the same shall be paid by my Trustees to the legatee or devisee free and clear of all assignments, attachments, anticipations, levies, executions, decrees and sequestrations, and shall only become the property of the Beneficiary when actually received by him or her as the case may be.

The said P. A. B. Widener was survived by one son, Joseph E. Widener, one of the petitioners in this proceeding, and by two children of a deceased son, namely George D. Widener and Eleanor W. Dixon, the other two petitioners in this proceeding.

The balance of the net income of the residuary estate has been distributed since the creation of the trust and is distributed today in the proportion of one-half to Joseph E. Widener and one-fourth each

to George D. Widener and Eleanor W. Dixon.   The respondent has determined that the taxable income received by these petitioners from the said estate was as follows:

| Year | Joseph E. Widener | George D. Widener | Eleanor W. Dixon |
|---|---|---|---|
| 1916 | $950,000.00 | $475,000.00 | $475,000.00 |
| 1917 | 1,000,000.00 | 499,998.05 | 499,998.05 |
| 1918 | 1,050,000.00 | 525,000.00 | 525,000.00 |
| 1919 | 916,754.17 | 458,376.83 | 458,376.83 |
| 1920 | 1,023,596.37 | 511,798.28 | 511,798.28 |
| 1921 | 1,051,556.68 | 525,778.34 | 525,778.34 |
| 1922 | 1,116,089.81 | 558,044.90 | 558,044.91 |

The trustees of the estate of P. A. B. Widener sold securities and real estate belonging to the corpus of the estate during 1919 and 1920 at prices which the respondent has determined to result in losses to the estate of $481,333.84 and $103,257.70, respectively.   During the same two years the trustees owned an office building, the Widener Building, and a hotel, the Ritz-Carlton, both located in Philadelphia.   They leased both properties and returned the rents received as income.   In 1919 and 1920 they charged off depreciation on the two buildings amounting to $183,681.51 and $184,023.70, respectively.   The respondent has determined these charges to be reasonable depreciation charges and has allowed them as deductions from the income of the estate as an entity.   The respondent disallowed these amounts as deductions in determining the petitioners' distributive shares of the income of the estate.

George D. Widener and Eleanor W. Dixon are also beneficiaries for life under a trust created by the will of their father, George D. Widener, Sr., who died April 15, 1912.

By this will he left one-third of his estate to his widow outright, and gave the income from the other two-thirds to his two children and their issue upon the principle of representation, the trust to continue until the death of the survivor of the two children.   Article fourth of this will provides, *inter alia:*

Fourth: I give, devise and bequeath all the rest, residue and remainder of my estate, real and personal, wheresoever situate and howsoever found, and in case of the decease of my wife before me, the whole of said estate to my Executors hereinafter named, their heirs, executors, administrators, successors and assigns, in trust nevertheless, for the uses, persons and purposes and with the powers following:

In Trust until the decease of my last surviving child, to divide the net income quarterly into as many parts or shares as at each time of quarterly distribution, there shall be children of mine then living, and children of mine then dead represented by descendants then living or by appointees hereunder and to subdivide the share falling to each set of descendants or representatives of a deceased child at any of said times of quarterly distribution amongst

the descendants *per stirpes*, upon the principle of representation, and to pay over to such child and descendant who at each of said times of quarterly distribution shall be found entitled, its share free and clear of its debts, contracts, engagements, alienations, and anticipations, and free and clear of all levies, attachments, sequestrations and executions.

George D. Widener and Eleanor W. Dixon survived their father. Neither of them has exercised the right to withdraw one-fifth of the principal of the trust. The income of the trust has been distributed since its creation and is distributed today between them equally. The respondent has determined that the taxable income received by each from the said estate was as follows:

| Year | George D. Widener | Eleanor W. Dixon |
|------|-------------------|------------------|
| 1916 | $122,071.65 | $122,071.64 |
| 1917 | 112,824.29 | 112,824.31 |
| 1918 | 111,482.23 | 111,482.23 |
| 1919 | 102,902.79 | 102,902.79 |
| 1920 | 109,449.04 | 109,449.04 |
| 1921 | 88,815.26 | 111,571.63 |
| 1922 | 120,057.61 | 120,057.61 |

The trusts created by the wills of P. A. B. Widener and George D. Widener, Sr., both became effective January 1, 1916. As of that date Joseph E. Widener was 42 years of age, George D. Widener was 27 years of age, and Eleanor W. Dixon was 25 years of age. Under the American Experience Table of Mortality their respective expectancies of life were 26.7 years, 37.4 years, and 38.8 years.

The present values as of January 1, 1916, of the petitioners' rights to receive, or life estates in, the income from the trust established by P. A. B. Widener are as follows:

Joseph E. Widener_____ $14,846,798.38
George D. Widener_____ 8,892,461.37
Eleanor W. Dixon_____ 9,038,696.24

The present values as of January 1, 1916, of the petitioners' rights to receive, or life estates in, the income from the trust established by George D. Widener, Sr., are as follows:

George D. Widener_____ $1,920,349.33
Eleanor W. Dixon_____ 2,010,080.14

The amounts received by each of these petitioners in distribution from these estates from January 1, 1916, to December 31, 1922, have not exceeded the January 1, 1916, value of their respective interests as set forth above.

OPINION.

STERNHAGEN: The first question to be answered is whether the activities of the petitioners in respect of their racing and breeding

stables constituted a business. An affirmative answer carries with it the right to deduct the expenses of their operation [1] and the losses sustained.[2]

The evidence establishes that the petitioners were engaged in the business of breeding, buying and selling race horses and entering them in racing contests for gain. They testified that they sought at all times to make a success of the enterprises and that their only measure of success was financial gain. Their horses were purchased as investments, the selective breeding was influenced by the thought of winning stakes and purses, and the disposition of horses was either for profit by sale or for riddance of those not economically useful. These are among the characteristics of business. *Wilson* v. *Eisner*, 282 Fed. 38; 2 Am. Fed. Tax Rep. 1744. The fact that petitioners were wealthy enough to afford a hazardous occupation in which they found pleasure despite discouraging losses does not establish the essential nature of the occupation. If they were utterly indifferent to whether there was loss or gain or if it were shown that the stables were an incident to the social or domestic aspects of their daily lives, the result might be against them, as in *Thacher* v. *Lowe*, 288 Fed. 994; 2 Am. Fed. Tax Rep. 1931. Instead, it appears that they devoted themselves seriously and assiduously to the economic promotion of their stables always in the hope that profit would result. The winning of a single race or the chance purchase of a yearling might at any time convert steady losses into a net profit, and make it a successful business. The expenses and losses are deductible and the determination of respondent in respect of the first two assignments of error is reversed. This likewise disposes of the third assignment, which is an alternative only and therefore need not be considered.

The second issue presented is whether the petitioners, being beneficiaries of the trusts established by the wills of P. A. B. Widener and George D. Widener, Sr., are each entitled, in the computation of their individual net income, to deduct an aliquot part of the losses and depreciation of the trust estate although the petitioners received from the trust the distribution of income without such deductions. This question has been ruled adversely to petitioners in *Baltzell* v. *Mitchell*, 3 Fed. (2d) 428; 5 Am. Fed. Tax. Rep. 5230, certiorari denied, 268

---

[1] SEC. 214. (a) That in computing net income there shall be allowed as deductions:

(1) All the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business, including a reasonable allowance for salaries or other compensation for personal services actually rendered; * * *

[2] (4) Losses sustained during the taxable year and not compensated for by insurance or otherwise, if incurred in trade or business;

(5) Losses sustained during the taxable year and not compensated for by insurance or otherwise, if incurred in any transaction entered into for profit, though not connected with the trade or business; * * *.

U. S. 690; *Louise P. V. Whitcomb*, 4 B. T. A. 80; *Elizabeth M. Abell*, 4 B. T. A. 87; *Mary P. Eno Steffanson*, 1 B. T. A. 979; *George M. Studebaker*, 2 B. T. A. 1020; *Helene R. McConnell*, 3 B. T. A. 260; *Marguerite T. Whitcomb*, 5 B. T. A. 191 (now on review in Court of Appeals, District of Columbia); *Sophia G. Coxe*, 5 B. T. A. 261; *O. Ben Haley*, 6 B. T. A. 782; *Arthur H. Fleming* v. *Commissioner*, 6 B. T. A. 900; and, as stated in *Arthur H. Fleming, supra*, the decision in *Julia N. DeForest*, 4 B. T. A. 1059, is, by reason of its different facts, not a contrary authority. The respondent has allowed the trustee of each estate to deduct the losses and depreciation in computing the net income of the estate, and this is in accordance with the foregoing decisions. The beneficiaries are not entitled to the deductions, and the respondent is on the fourth assignment sustained.

The last error assigned is that the respondent taxed the petitioners in respect of the entire distributions received by them annually from the income of the two trusts of which they are beneficiaries. Petitioners contend that the value of the expectancy or life interest, the right to receive annual income, was capital to each of them acquired by bequest, and that they are entitled to set aside untaxed the annual distributions until they aggregate this so-called capital sum before taxing any part thereof as income. They say that the expectancy was property clearly capable of valuation, the value of which was substantially agreed upon, and that since this property was expressly bequeathed it is exempt from income tax by sections 213 (b) (3) of the Revenue Acts of 1918 and 1921 [3] here involved; and furthermore, that otherwise the Constitution would be violated.

The distributions in question are, by the terms of the trusts, made only from the income of the trust, and do not invade the corpus. They are not fixed annuities, such as were involved in *Ronald DeReuter*, 7 B. T. A. 600, to be paid in any event whether from corpus or income. If there be no income of the trust there will be no annual distribution. Nor were they acquired by investment, as the court held in respect of the periodic payments in *Warner* v. *Walsh*, 15 Fed. (2d) 368; 6 Am. Fed. Tax Rep. 6340.

The present situation is squarely within *Irwin* v. *Gavit*, 268 U. S. 161; 5 Am. Fed. Tax Rep. 5380, and, as in that case, it is not to be supposed that Congress in section 213 (b) (3) intended to restrict

---

[3] SEC. 213. That for the purposes of this title (except as otherwise provided in section 233) the term " gross income "—

　*　　　*　　　*　　　*　　　*　　　*　　　*

(b) Does not include the following items, which shall be exempt from taxation under this title:

　*　　　*　　　*　　　*　　　*　　　*　　　*

(3) The value of property acquired by gift, bequest, devise, or descent (but the income from such property shall be included in gross income).

the scope of the broad intendment of section 213 (a).[4]   While it may be, so far as the court's opinion discloses, that no attempt was made by Gavit to establish a value of the expectancy at death, claiming rather that all distributions were in themselves the bequest, nevertheless the reasoning of the opinion gives no warrant for the belief that the decision would have been at all different if such valuation had been fixed in the record.   The taxpayer argued that the periodic receipts by him were but the realization of his bequest and hence exempt, and the court held that they were entirely income.   The court recognized that the expectancy constituted an interest in the fund itself, and since it had long been recognized (under the 1898 legacy tax act, *United States* v. *Fidelity Trust Co.*, 222 U. S. 158; *Simpson* v. *United States*, 252 U. S. 547; 4 Am. Fed. Tax Rep. 4735) that such interest was property of value subject to death duty (a doctrine prevailing in several of the States) we are compelled to believe that the decision in the *Gavit* case was reached in the full light of that established law.

These two taxes—the death duty, whether upon the legacy or upon the estate, and the income tax—are wholly different in concept and theory, and the fact that they may impinge upon each other in ultimate incidence by striking at the beneficiary so as to diminish first his inheritance and then his income therefrom, is a legislative matter which Congress has presumably considered.   Our present concern is to consider whether the distributions of what is indisputably income of the trust are income to petitioners, and if so, whether as such the statute taxes them or exempts them.

The petitioners argue that, irrespective of the statutory exemption of bequests, the full amount of distributions is not income because out of such distributions they are entitled to recover, as capital, the value of the right to receive them.   This is the theory—that because the right had a value which would serve to measure a legacy tax it was capital of petitioners thenceforth, that it is thereafter being diminished, that the diminution is in some way brought about by the distributions of income, that such distributions are the only means to offset the diminution, and hence to the extent of such offset the distributions are a "return of capital."   We may pass the question whether in the true sense this "right to receive income" is capital— whether the capital, if any, is not represented only by the interest in

---

[4] Sec. 213. That for the purposes of this title (except as otherwise provided in section 233) the term " gross income "—

(a) Includes gains, profits, and income derived from salaries, wages, or compensation for personal service * * * of whatever kind and in whatever form paid, or from professions, vocations, trades, businesses, commerce, or sales, or dealings in property, whether real or personal, growing out of the ownership or use of or interest in such property; also from interest, rent, dividends, securities, or the transaction of any business carried on for gain or profit, or gains or profits and income derived from any source whatever. * * *

the fund which produces the income—whether it is not subversive of the entire concept of income to say in turn that a gratuitous right to receive it is capital and hence the realization upon that right is recovery of capital. There is a point of revolt against the tyranny of logic. But suppose it is capital, wherein is it impaired or diminished? It persists in full force. It begins at death as a right to receive income from, and thus an interest in, the fund, and continues throughout in as great a measure as it began. To be sure, the lapse of time affects the probable number of future payments, but how can this change the nature of the payments as income when received? Suppose they were to go on forever, would they be more capital because of longer expectancy, or less capital because beyond the formula of valuation? Nothing invades the interest in the fund and no receipt of the distributable income reduces it—a complete distinction from the situation in *Doyle* v. *Mitchell Bros. Co.*, 247 U. S. 179; 3 Am. Fed. Tax Rep. 2979, cited by petitioners. Why then should any part of the distributable income be left untaxed, since it takes nothing from the right to receive it? Income it is called in the trust instrument and income it is, and hence within the language and intendment of section 213 (a). This is substantially in accordance with *Ernest P. Waud et al., Executors*, 6 B. T. A. 871, and with the *obiter* of *Ernest M. Bull, Executor*, 7 B. T. A. 993, which in effect say that income is no less income because it is received pursuant to a preexisting valuable right.

The second question then arises, whether this income is a bequest and hence within the exemption of section 213 (b) (3). This, as already stated, is in our opinion answered in *Irwin* v. *Gavit, supra*, to the effect that the income itself is not the bequest, which in our opinion carries with it the decision that the income is not to be limited by reason of a valuation given to the right to receive it. It is, as petitioner contends, established that a testamentary right to the income from a fund is subject to legacy tax and for that purpose is capable of valuation. But this does not bring it within the intendment of the exemption of section 213 (b) (3). The Supreme Court in the *Gavit* case said that that exemption provision " assumes the gift of a corpus and contrasts it with the income arising from it, but was not intended to exempt income properly so-called simply because of a severance between it and the principal fund. No such conclusion can be drawn from *Eisner* v. *Macomber*, 252 U. S. 189; 3 Am. Fed. Tax Rep. 3020. The money was income in the hands of the trustees and we know of nothing in the law that prevented its being paid and received as income by the donee."

Furthermore, while the section exempts the value of bequests it carefully provides that the income from the bequest is not exempt.

Here, as we have seen, the distributions are the income from the petitioners' interest in the fund and are, as such, expressly removed from the exemption.

What has been said is sufficient to demonstrate that the distributions are income under the Constitution as well as under the statute, and that Congress was therefore authorized by the Sixteenth Amendment to tax it as it did. In essence there is a similarity in the argument to that of *Bowers* v. *Taft*, 20 Fed. (2d) 561, in that the value of the gift at the time of transfer is said to be capital and as such necessarily to be recovered before finding income. But the Circuit Court of Appeals held that the gain was properly subject to tax to the donee as it would have been to the donor. And in the *Gavit* case Mr. Justice Holmes seemed to have the same concept when he said that income in the hands of the trustee was taxable when received by the donee.

Petitioners cite *Warner* v. *Walsh*, *supra*. That case is distinguishable for at least one reason, that the court expressly laid it on the ground of a purchased annuity, the consideration for which was the widow's relinquishment of her fixed and valuable rights. The value of the consideration was a capital investment, which is not the situation here.

It is our opinion that the full amounts of the distributions are taxable income to petitioners, and the respondent is sustained as to the fifth assignment.

Reviewed by the Board.

> *Judgment will be entered on 15 days' notice, under Rule 50.*

ARUNDELL did not participate.

SMITH, TRAMMELL, TRUSSELL, LOVE, and VAN FOSSAN dissent on the first point.

LANSDON, dissenting: I disagree with the action of the Board in holding that the losses sustained by the petitioners, Joseph E. Widener and George D. Widener, in maintaining and operating racing stables, are deductible from the respective gross income of the petitioners in each of the several taxable years.

Horse racing has long been called the "sport of kings." There is a well defined difference between sport and business. The one is pursued for personal pleasure, relaxation or recreation; the other is engaged in for the purpose of earning profits or as a means of livelihood. It is one of the characteristics of sport that it wastes capital. On the other hand a primary attribute of business is the conservation and increase of capital. Sport employs wealth to secure pleasure; business utilizes it to create more wealth. The motives that impelled one of these petitioners to enter the horse-racing business are set forth

in the findings of fact as that "He was fond of horses and wanted an outdoor occupation." This does not suggest an intention to engage in a business for profit.

In the cases of both the Wideners there is in the record a very definite statement of receipts, expenses and losses for each of the taxable years, but there is no information as to the amount of capital employed. It is hardly possible to determine whether an enterprise is conducted as a business if the amount of the investment is not known. It is obvious from the figures here that unless the stables of the petitioners were heavily financed at the outset, the original capital was lost several times over prior to and during the taxable years. The huge annual deficit disclosed by the record must have been made good by equally huge additional capital contributions. This is a process aptly described in the speech of the common man as "throwing good money after bad" and is rarely indulged in by real business men. Ordinarily it is impossible in an enterprise carried on for profit or as a means of livelihood, but it is not at all an unusual procedure for those who, regardless of expense, pursue some sport, recreation or pastime for personal gratification. The excess-profits-tax law recognized the principle that capital employed in business for profit is entitled to a fair return before any income emerges. If these petitioners were in a position to claim an 8 per cent return on their capital investment and also to reduce their respective gross incomes by the amount of these alleged losses, it is plain that in time they might entirely avoid any payments to the public revenues, even though they were eventually in receipt of substantial annual receipts in excess of expenditures.

Certainly no one would contend that the fact that an enterprise sustains losses in a given year or even for a series of years is proof that it is not conducted for profit. Due to commercial conditions, crop failures, changes in an art, the vagaries of fashion or any one of numerous other causes, many men have found themselves forced to continue a losing business year after year in the hope of recouping their fortunes by some favorable turn of affairs. Such conditions do not exist here. These petitioners voluntarily engaged in an enterprise that is notoriously uncertain. They made good their losses and continued their operations after it was clear that there was little if any prospect of profit. The motives and purposes that governed them were not based either on the hope of or the desire for profits. They were willing to pay and able to pay for the pleasure which they derived from indulging in the "sport of kings" and doubtless the resulting personal gratification was ample compensation for the costs incurred.

The findings of fact, *supra*, indicate that racing rather than the breeding and sale of horses was the principal purpose for which

these petitioners conducted their alleged business. It is recited that the employees of the stables included trainers, jockeys, blacksmiths, rubbers, exercise boys, and veterinarians. Services rendered by such men are peculiarly necessary in conducting a racing stable but they have a relatively small place in the organization and operation of a breeding farm. None of the so-called business activities of the petitioners during the taxable years appear to have resulted in profit or to have been conducted with any hope of profit. Had these enterprises been conducted for gain there should have been some sales of proved and winning horses at profitable prices. It appears however that only those animals that had been tested and found wantin. in speed were sold. Apparently all the sales set forth in the record were made not for purposes of gain but to realize losses already manifest, in proved lack of racing qualities or to prevent further losses.

Only the taxable years 1919, 1920, 1921, and 1922 are involved in these appeals. It would seem therefore that the finding that after the results of the operations for 1919–1922, inclusive, were known, Joseph E. Widener reorganized his stables and made a greater effort to secure favorable results, is not pertinent here. The fact that some time after the last of the taxable years this petitioner imported a breeding sire from England and received large stud fees for the services of that animal has no relation to the issues now under consideration. For all that the record shows, this animal may not have been bought until some time in the year 1924. None of the amount of $110,000 earned as stud fees was received in either of the taxable years. Very rarely, if at all, should tax liability for a given year be determined by events occuring subsequent to such year.

The taxes here in controversy were imposed by act of Congress at a time when the republic was in desperate need of revenue. Every good citizen values the privilege of contributing to the public income in proportion to his ability to pay. Had Congress elected, as is within its power, to levy a tax on gross income, this and thousands of other tax disputes would have been avoided. For reasons that doubtless are sound and defensible, the law-making body chose to tax net income. This made it necessary to lay down rules governing credits, exemptions, and deductions.

In the statutes enacted for the guidance of all who have to do with the assessment and collection of Federal income taxes, there are provisions that each taxpayer is entitled to deduct from his gross income for any taxable year all the losses sustained and all the ordinary and necessary expenses paid or incurred in carrying on his trade or business in such year. The losses which these petitioners seek to deduct resulted from the payment of expenses incident to the conduct of racing stables. If such expenses are not in themselves deductible,

neither are losses resulting therefrom. While the law nowhere says so in exact terms, it was obviously the intention of Congress to authorize the reduction of gross income by the cost of producing such income before the determination of tax liability. In this connection there is an express provision that personal expenses are not so deductible. This principle rests on the sound basis that business expenses represent the cost of producing income, while personal expenses relate only to the uses that are made of such income. The deductions here claimed were not losses incurred in the production of any part of the income which the respondent proposes to tax, nor, in my judgment were they sustained in carrying on any trade or business for profit. They resulted from expenses purely personal to the petitioners.

I am convinced that Congress had incomes such as we have under consideration in mind when it provided that there should be no deduction from gross income on account of personal expenses. To permit these petitioners and others of their type to reduce their tax liability by the deduction of the costs of maintaining racing stables, expensive estates, and other similar activities, would result in a shifting of the burden of public taxation which it seems to me would be wholly inconsistent with the public interest. I am satisfied that these petitioners have not sustained the burden of proof necessary for us to find that the alleged losses were sustained during the taxable years in a business conducted for profit. I feel that the allowance of the deductions claimed would be contrary to the intent of Congress, detrimental to the public interest and a dangerous perversion of the sound and equitable principles upon which just taxation must rest.