Everett R. Taylor and Emeline H. Taylor v. Commissioner.
Taylor v. Commissioner
Docket No. 2550-67.
United States Tax Court
T.C. Memo 1969-186; 1969 Tax Ct. Memo LEXIS 109; 28 T.C.M. (CCH) 941; T.C.M. (RIA) 69186; September 16, 1969, Filed Everett R. Taylor, pro se, 1746 13th St., Oakland, Calif. James Booher and Jeffrey E. Boly, for the respondent. SIMPSON
Memorandum Findings of Fact and Opinion SIMPSON, Judge: The respondent determined deficiencies in the petitioners' income tax as follows: Year Ending December 31
Deficiency
1963
$1,260.76
1964
5,404.00
1965
7,516.00 The issue presented is whether amounts spent for the development of a format for printing Biblical and other texts, and for the printing of various booklets, were paid or incurred in a trade or business of the petitioner so as to be deductible as business expenses under section 162, Internal Revenue Code of 1954. [1]
Findings of Fact [2]
*110 Everett R. Taylor and Emeline H. Taylor are husband and wife who resided in Diablo, California, at the time the petition was filed in this case. They filed joint Federal income tax returns for the taxable years 1963, 1964, and 1965 with the district director of internal revenue, San Francisco, California. Everett R. Taylor will hereinafter be referred to as the petitioner. For many years, the petitioner has operated as a sole proprietorship a business called Taylor Roof Structures, engaged in 942 the construction of commercial roofs. For each of the years 1963, 1964, and 1965, this enterprise had gross receipts of over one million dollars a year and had net income, computed without regard to the expenditures in issue in this case, of over $50,000 a year. Since 1952, the petitioner has written numerous letters, pamphlets, and books on political, social, economic, and religious subjects. He developed a mailing list of 1,200 people, comprising what he calls his "informal committee of correspondents," to whom he sent 58 general letters on various topics between 1952 and 1962, for a total of about 70,000 letters. A principal and typical topic of these letters in the early and *111 mid-1950's was the need for a new Bill of Rights abolishing the power of the Government to legislate concerning education and the rights of laborers, to coin money, to levy taxes (with some exceptions), and to borrow money. In 1954, the petitioner underwent a religious experience and became deeply and firmly committed to a Christian belief. Thereafter, his writings relied on religious and Biblical doctrines. Typical examples of his writings after that time are "Toward Education!" (1955), urging the removal of Government from education; "Toward the Victory" (1962), calling for a victory over Satan's influence in the modern world through a personal and national commitment to Jesus Christ; "Are Anglo-Saxon People the Lost 10 Tribes" (1962); "Mr. K. and His Shoes" (1961); "Vostok II" (1961); "Prayer for Pres. Kennedy" (1961); "Teaching" (1961); "Eichmann" (1961); "Fear" (1961). During the 1950's, the petitioner attempted to develop two systems of logic, which he called "differential" and "integral" reasoning. After 1954, the King James Version of the Bible was the principal source of the postulates of these systems of logic, and the petitioner's writings relied heavily on his interpretation *112 of the Bible and of its relevancy to modern problems. He mailed to his informal committee several letters and tracts explaining his methods of reasoning. In addition to the development of this Biblically based logic, the petitioner, in the years prior to 1963, began to develop a way of presenting ideas on paper to make them more easily understood by the reader. His early efforts employed punctuation marks in the margin of a page to classify the ideas presented. In 1962 or 1963, the petitioner developed what he called "SSS Communication." SSS, which stands for "skim, skip, scrutinize," employs irregular left-hand page margins and multicolored printing. In SSS, a sentence or phrase is described in two ways: Its positioning with respect to the margin highlights its relation to other phrases and sentences, as "coordinate," "subordinate," and "ascensive"; while the color in which it is printed describes its "inherent characteristics," as "positive, negative, tentative, or limitative." After SSS, sometime in 1965, the petitioner developed "Analytic Exposition," which was a version of SSS modified to eliminate some of the complexities in SSS. In 1967, the petitioner embarked on the development *113 of "Seven Powered Communication," a method of exposition and education directed toward young children. Seven Powered Communication employs some of the ideas developed in SSS and Analytic Exposition and depends on the personal involvement and interaction of the teacher and pupil. Almost all of the petitioner's writings prior to 1963 were distributed free of charge to his informal committee and to others. Occasionally, his writings indicated that contributions would be accepted, and that contributions could be expected to balance expenses of publication and mailing. However, the amount of contributions was nominal, and, until 1965, the petitioner felt that the donations did not justify the expense of recording and carrying them on books and financial statements; he therefore turned all donations over to a "worthy cause," usually an evangelist named Keith Ward. So far as the record shows, only two of the petitioner's pre-1963 writings were copyrighted, only one was offered for sale or bore a price, and almost all expressly or impliedly authorized and encouraged the reader to make free use of the ideas and methods presented. "Toward the Victory" was offered for sale at 50 cents a copy, *114 but the evidence indicates that the sales were insignificant. In the years 1963, 1964, and 1965, the petitioner's records show that he expended the following amounts on the development, publication, and distribution of his writings: 943 1963
$ 2,741.85
1964
12,005.36
1965
15,718.88 [3] During these years, the only revenue from these activities, aside from a small amount of contributions received by the petitioner and turned over to a worthy cause, was $240 received in 1965. This sum was *115 deposited in a bank account established in 1965 to receive contributions received as a result of the petitioner's research and writing but was not shown on the petitioner's income tax return. The work to which these receipts and expenditures relate consists of a survey of 1,000 ministers to determine their reaction to the use of Analytic Exposition as a means of presenting the Bible to laymen, and the publication of the following 6 documents: (1) A letter dated March 1963, uncopyrighted, of which 1,200 copies were made, was mailed free of charge to the informal committee of correspondents. Purporting to be the third in a series dealing with problems raised by the "Ole Miss-Meredith affair," the letter argues that education should be taken out of the hands of both State and Federal Governments, so that schools would teach Christian doctrines, and racial problems could be solved by parents inter se without interference of law. The letter employs both differential and integral reasoning, relying heavily on Biblical statements and admonitions, and its purpose was not to raise money but to develop the petitioner's system of logic and to persuade correspondents of the position stated therein. *116 (2) "SSS Communication," a booklet of 55 pages, copyrighted by the petitioner in May 1964, of which 2,000 copies were printed, was given free of charge to members of the informal committee of correspondents. This booklet explains the SSS system of exposition and differential and integral reasoning and shows how it can be applied to "free style" writing, to exposition of religious texts, to the format of textbooks, to the presentation of arguments, to correspondence, and to the format of advertisements. The booklet bears no list price and states on the front page "You are free to use the methods of this research without special permission," and elsewhere states that the booklet is free because the Lord's intervention has made the petitioner's business affairs prosper. (3) "Receive Ye One Another," a booklet of 5 pages, copyrighted September 1964, presented Romans 14:1 to 15:7 from the Bible in SSS form. One thousand copies were printed, but none was ever offered for sale or otherwise distributed; at the date of trial in this case, the petitioner retained all but two or three of the copies printed. (4) "Romans," a booklet copyrighted December 1964, of which 2,000 copies were made, *117 presented the book of Romans from the Bible in SSS form. The petitioner distributed 1,000 copies of this booklet to people on his informal committee of correspondents and people on his construction business mailing list, who affirmatively responded to a questionnaire asking if they wished to receive a free copy of the booklet. The booklet was also offered for sale through bookstores at $1 per copy, and an advertising poster was prepared to encourage sales. However, the record does not indicate how many, if any, of the booklets were sold. The sales effort was not successful, and the petitioner believes that the reason for the failure was the four-color format of SSS. In a subsequent publication, the petitioner stated that the reader could have a copy of "Romans" for the asking. (5) "The Gospel According to St. John," an uncopyrighted booklet of 130 pages, of which 5,000 copies were published in August 1965, presented that book from the Bible in Analytic Exposition, the three-colored variation of SSS. The petitioner attempted to interest pastors in using the booklet, but that effort proved unsuccessful. He then went to the University of California at Berkeley and spent 2 hours a day *118 for 3 or 4 months distributing booklet to students and discussing their reactions to it and its format; approximately 5,000 copies, including some from a second edition, discussed later, were so distributed. The first edition stated on its first page, "Single copies are free, but contributions are accepted." During 1965, $240 in contributions was received on account of this booklet and "revolution? 944 Mario Savio Says:", another publication of the petitioner. (6) "revolution? Mario Savio Says:", a 4-page leaflet of which 5,000 copies were printed, urged readers to "seek truth in the person of Jesus Christ" and was distributed without charge to students at Berkeley. The leaflet stated that the reader could obtain free "The Gospel of Jesus Christ" by writing to Taylor Research. Although this leaflet did not solicit contributions, part of the $240 received by the petitioner in 1965 was attributable to it. In late 1965, an agent of the respondent began an audit of the petitioner's tax returns for the years 1963 and 1964; later the year 1965 was included in the audit. In mid-January 1966, the petitioner attended a conference with representatives of the respondent concerning *119 the audit and the proposed disallowance of the claimed expenses. At that conference, the petitioner stated that he thought the deductions in question were allowable because he was a partner with the Lord who rewarded his religious endeavors with increased construction business success. At that conference, he did not state that he was in the communications business or that he intended or expected to make a profit from his communications activities. After that conference, the petitioner published several other pamphlets in Analytic Exposition, which bore a list price, as well as a price list for other of his publications. A second edition of "St. John," consisting of 5,000 copies, was published in 1966; this edition bore a copyright and a per-copy price of $1.50. In 1967, the petitioner developed "Seven Powered Communication." Except as previously stated, the petitioner made no attempt to market his writings or the methods used therein prior to or during the years at issue, nor, so far as the record shows, at any time since. At no point in the record of this case does the petitioner state that it was his intention, purpose, hope, or expectation during 1963, 1964, or 1965, to make *120 a profit from his communications activities. During these years, as in prior years, the purpose of the petitioner's research and writing was not to make a profit, but was to disseminate and encourage discussion of his ideas and beliefs, his logic, and his system of exposition and communication. Opinion The question for decision is whether the expenditures at issue in this case were expenses of a trade or business. Sec. 162. The petitioner claims that during the years 1963, 1964, and 1965, he was in the trade or business of developing a method of communication, and that the expenditures were made for research and development necessary to that trade or business. According to his view, the losses sustained by him in those years are typical of many new businesses, and a new business is allowed to deduct its expenses even though it sustains losses in its early years. The petitioner does not now argue that the expenditures in question were expenses of his construction business, directly or indirectly, and the evidence does not support such an argument. The difficulty with the petitioner's argument is that the sine qua non of a trade or business as described in section 162 is the existence *121 of a profit motive. E.g., Szmak v. Commissioner, 376 F. 2d 154 (C.A. 2, 1967), affg. a Memorandum Opinion of this Court; Lamont v. Commissioner, 339 F. 2d 377 (C.A. 2, 1964), affg. a Memorandum Opinion of this Court; Henry P. White, 23 T.C. 90 (1954), affd. per curiam 227 F. 2d 779 (C.A. 6, 1955); Frederick A. Purdy, 12 T.C. 888 (1949). There have been many cases discussing the nature of the required motive - its intensity, its reasonableness, its consistency. Although there is some disagreement as to whether the requisite profit motive need be reasonable or dominant (compare, e.g., Mercer v. Commissioner, 376 F. 2d 708, 710 (C.A. 9, 1967), revg. a Memorandum Opinion of this Court, with Godfrey v. Commissioner, 335 F. 2d 82, 84 (C.A. 6, 1964), affg. a Memorandum Opinion of this Court, the cases are consistent in holding that a profit motive of some description is a prerequisite to the finding of a trade or business. It is unnecessary for us to pass upon the precise formulation of the requirement, because we are forced to conclude that the petitioner's activities during 1963, 1964, and 1965 in *122 research, development, writing, and publishing were not motivated to any degree by a hope or expectation of profit, reasonable or unreasonable, current or future, from such activities. The petitioner is a successful businessman, deriving substantial income from his construction business. This business provided him the resources to carry on the 945 research and publishing activities in question here. There is no indication of an intent to augment his construction business income with income from these activities. Although revenues were only a small fraction of the expenses incurred in these activities, this was, so far as the record shows, a matter of complete unconcern to the petitioner. The petitioner is an obviously sincere man with firm convictions in religious, political, economic, and social matters, and his activities in writing and publishing during the years before us, which were seriously and vigorously pursued, were directed in large measure to the dissemination of those convictions. However, almost all of his writings were distributed free of charge, and the evidence, as we have detailed it in our Findings of Fact, compels the conclusion that the petitioner did *123 not intend or attempt to make a profit from the sale of his writings during such years. Although contributions to his efforts were accepted, they were not strongly solicited and were in no way a condition of the petitioner's continuing with his work of writing and distributing his ideas. Indeed, until 1965, such contributions as were accepted were not recorded on the petitioner's books, but were given away to "worthy causes," a factor indicating the petitioner's relative lack of concern even with recouping costs, to say nothing of profit. Although a bank account was opened in 1965, and donations deposited therein, the record in no way supports a conclusion that this marked a fundamental change in the petitioner's purposes, objective, and motivation. The petitioner concedes on brief that immediate profit was not the goal of his efforts. However, he contends that his research and writing activities were directed toward the development and perfection of a system of communication, an "expositional format," and that his publications were significant not for what they said but for the manner in which ideas were expressed. We have some difficulty accepting the proposition that the ideas *124 expressed in his writings were not important to the petitioner; his writings show him to be a person of firm convictions, with a desire to express them and to convince others of their merit. However, we do not doubt that one of the petitioner's purposes was to develop an expositional format, which would better convey to the reader the sense of the writing, but we have no evidence that the enterprise was profit-oriented. At every step of the way, from the introduction of differential reasoning to the presentation of Analytic Exposition, the petitioner carefully explained his methods in his writing and urged other people to use them, free of charge. The record contains not a scintilla of evidence to suggest that during the years before us the petitioner had the hope or intention of using his system of communication, if, as, and when successfully developed, to produce profits. He did not so testify at trial, he did not represent to the respondent's agents that his activities were profit oriented, and his generosity with his ideas and his methods, coupled with the lack of any indication of a desire to reap material benefit from his writing and publishing activities, compel the conclusion *125 that the quest for profit comprised no part of the motivation for these activities. Although the petitioner did, after the conference with the respondent's representatives in 1966, adopt the practice of placing a price on his publications, the evidence is still insufficient to indicate that in the years before us he was engaged in establishing a business for profit. In Henry P. White, supra, at 94, we said: The gratification derived from an occupation worth doing, possibly beneficial to others and probably requiring long hours of arduous labor, must still not be confused with an intention to return a profit. * * * That admonition is relevant here; we accept the indisputable fact that the petitioner's work was important to him and perhaps to others, but find that his publication activities in the years before us were not directed toward making a profit. He was indifferent as to whether his publication activities produced a profit. Our finding on this issue effectively distinguishes all the cases relied on by the petitioner. E.g., Doggett v. Burnet, 65 F. 2d 191 (C.A.D.C. 1931); Wilson v. Eisner, 282 F. 38 (C.A. 2, 1922); Margaret E. Amory, 22 B.T.A. 1398 (1931); *126 George D. Widener et al., 8 B.T.A. 651 (1927), affd. 33 F. 2d 833 (C.A. 3, 1929). In those cases, the Court allowed deductions for the losses of a new business because it found that the taxpayer was engaged in business for profit. Decision will be entered for the respondent. 946 Footnotes
1. All statutory references are to the Internal Revenue Code of 1954.↩
2. The stipulation of facts in this case consisted entirely of a list of documents which were introduced into evidence, some of which are referred to or described in our Findings of Fact.↩
3. The following schedule shows the amounts claimed as deductions on the petitioner's return for "research" - the activities at issue in this proceeding - and the amounts disallowed by the respondent: Year
Claimed
Disallowed
1963
$ 2,815.58
$ 2,275.58
1964
12,962.00
11,205.00
1965
17,159.00
14,779.00 The difference between the amounts claimed and the amounts disallowed represents the cost of Christmas cards which the respondent determined was an expense of the petitioner's construction business. The evidence does not explain the discrepancy between the figures shown on the returns and those shown on the petitioner's books and records.↩