W. Jane Luce v. Commissioner.
Luce v. Commissioner
Docket No. 2767-68.
United States Tax Court
T.C. Memo 1970-203; 1970 Tax Ct. Memo LEXIS 154; 29 T.C.M. (CCH) 894; T.C.M. (RIA) 70203; July 21, 1970, Filed W. Jane Luce, pro se, Shawnee Mission, Kan. David A. Pierce, for the respondent. FORRESTER
Memorandum Findings of Fact and Opinion FORRESTER, Judge: Respondent determined deficiencies in petitioner's Federal income tax for the years 1965 and 1966 in the amounts of $1,729.26 and $1,122.03, respectively. Concessions having been made, the only issues for decision are: (1) whether *155 petitioner was engaged in the business of breeding and training horses for sale in 1965 and 1966, so that resulting losses from such "business" are deductible under sections 165(a) and (c)(1)[1] in those years, and if so, whether the losses have been substantiated; and (2) whether petitioner has substantiated various deductions claimed in her 1966 income tax return, above the amount allowable as a standard deduction under section 141. Findings of Fact Some of the facts have been stipulated. The stipulations and exhibits attached thereto are incorporated herein by this reference. Petitioner, W. Jane Luce (hereinafter sometimes referred to as Jane), was a resident of Shawnee Mission, Kansas, at the time her petition was filed. She filed her Federal income tax returns for the years 1965 and 1966 with the district director of internal revenue for the district of Missouri, using her business address in Kansas City, Missouri. During the years in issue and for sometime prior thereto, Jane lived with her mother in a home which was owned and maintained by her mother. In 1965 and 1966, she held an executive position *156 with, and was plant manager of L-U-C-E Manufacturing Company (hereinafter sometimes referred to as the Company), an enterprise which was also owned by her mother. Her executive position, which she had held since 1959, and her position as plant manager required daily attendance at the Company's plant located in Kansas City, Missouri. In both 1965 and 1966 her salary at the Company was $15,000 per year. Since her youth Jane has worked with horses. She taught riding lessons and at one time or another has participated in horse-show activities as a student, teacher, participant and horse owner. During the years in issue and for some years prior thereto, she was on the National Advisory Council of the United States Equestrian Team and a member of both the United 895 States Pony Club and the United States Combined Training Club Association. In 1959 Jane began to breed and to train horses for show competition. She had already bought three brood mares in 1957 and, to increase her activities, added two more mares in 1959. During 1959 she also obtained the part-time services of a trainer, who was to have final judgment on all horse purchases. In subsequent years Jane purchased several *157 more brood mares - two in 1960 and 1961, and one in 1962. Any other horses owned by Jane were the offspring of her mares. Since Jane had no property on which to keep the horses, they were boarded with others. In the early stages of her horse training and breeding activities, the horses were relocated at least four times at different boarding places. Other than for two mares which were boarded eventually in California, one mare boarded by the United States Equestrian Team and two colts boarded in Texas, Jane's horses were all boarded in the Kansas City area. Of the original three mares purchased in 1957, one died and one became windy (a horse disease which prevents training for show purposes). The third, named Play the Field, which at one time was boarded free with the United States Equestrian Team, showed great promise for future Olympic competition but, due to several incidents, never engaged in competition. Of the five horses purchased between 1960 and 1962, two showed promise for future competition with the United States Equestrian Team and were sent to California for future testing, where they were boarded and eventually sold by the boarders to pay for their keep; one died, *158 after having given birth to three colts - two of which also died; one turned lame and was bred; and the last one, purchased in 1962, was eventually leased for breeding. The two horses purchased in 1959 were sold at a loss in 1961. This was Jane's only sale of horses. Two of her other mares were sold at a public auction in California to pay for their board expenses by the parties who boarded them. The two colts boarded in Texas were also sold by their boarders to pay for their keep. The training and boarding of a mare costs approximately $1,800 for 18 months. Board for a colt or filly was approximately $360 a year. Jane never kept cost control records or books of any kind on the cost of her horse activities other than part of her canceled checks, miscellaneous receipts, and bills. She did keep registration papers on each horse to show its breeding. Over the years Jane did not maintain a stable name or a name under which she was breeding horses. When she wrote to others concerning her horses, she utilized her employer's stationery. In 1965, Jane spent $127.69 for various horses' supplies, including leather halters, lead shanks, and books; $135.43 on vitamins and various other *159 supplements for horses to keep them in good health; $76.84 for dirt for horse stalls; $87 on veterinary fees; $2,304.38 for the boarding and training of mares and colts; and $213.81 for the transportation of her horse Play the Field. In 1965, she also paid $195 in dues to the Mission Valley Hunt Club; $30.75 in dues to the United States Combined Training Club Association; $16 in dues to the United States Pony Club; and $10 to the American Horse Show. From 1959 to 1966, Jane reported losses in her income tax returns from her horse activities as a business loss. In his statutory notice of deficiency for 1965 and 1966, respondent determined that the losses claimed in petitioner's returns for those years, consisting of expenses and depreciation, were not deductible because no trade or business was engaged in and because the expenses were not substantiated. In her return for 1966, Jane also deducted $585 as a charitable contribution, consisting in part of donations of three basset puppies, which she valued at $150 each, to various organizations. She also reported a theft loss of a totebag in which there was a cigarette case, eyeglasses and case, alligator wallet, silver goblet, and *160 miscellaneous items. She valued the items at $274.95, and deducted $174.95 on her return. Both of these deductions were disallowed in respondent's statutory notice of deficiency for lack of substantiation and in lieu thereof, the standard deduction of $1,000 was allowed. Petitioner also deducted $429.25 in state taxes for 1966 but conceded at trial that the amount of taxes was not in excess of $297.25. Opinion Petitioner bred and trained horses. She argues that in so doing she was engaged in a trade or business and under section 896 165(a) and (c)(1) [2] may deduct the losses incurred in the business. Respondent argues, on the other hand, that petitioner was engaged in the pursuit of a hobby and hence all expenditures were personal and nondeductible. Petitioner has the burden of proving that the claimed losses were incurred in a trade or business and in so doing she must show that she had a bona fide intention and expectation of making a profit. It is not necessary however, that the expectation be a reasonable one, only that it be genuine. The question is one of fact. Margit Sigray Bessenyey, T.C. 261, 274 (1965), affd. 379 F. 2d 252 *161 (C.A. 2, 1967), certiorari denied 389 U.S. 931 (1967); American Properties, Inc., 28 T.C. 1100, 1111 (1957), affirmed per curiam 262 F. 2d 150 (C.A. 9, 1958); Henry P. White, 23 T.C. 90, 94 (1954), affirmed per curiam 227 F. 2d 779 (C.A. 6, 1955).
It is well established that breeding and raising horses for sale may constitute a trade or business. Commissioner v. Widener, 33 F. 2d 833 (C.A. 3, 1929), affirming 8 B.T.A. 651 (1927); Theodore Sabelis, 37 T.C. 1058 (1962). Likewise, training horses for sale as show horses falls within *162 a trade or business category. After a careful consideration of the factors in this case, however, we find that Jane was not so engaged. For most of her life, Jane had taken a personal interest in horses; she had trained them, taught others to ride and was a champion rider. In addition, she had for sometime been a member of numerous horse clubs and was on the National Advisory Council of the United States Equestrian Team. Before Jane began to expend large sums of money for the purchase of horses and their upkeep, it is clear that her hobby was horses. She derived great pleasure and personal satisfaction from her activities, and while this fact does not prevent said activities from being pursued as a trade or business, it nevertheless indicates to some extent that training and breeding of horses may merely have been a continuation of her hobby. Since Jane lived with her mother she could afford to expend sizable sums out of her salary of $15,000 to pursue a more expensive extension of her horse activities. While the above factors indicate that Jane was engaged in a hobby, the manner in which her horse activities were carried on, we believe, confirms it. The venture was run in a most *163 "unbusiness like" fashion from the start. Jane was at work at the Company daily and hence did not personally supervise much of her horse activities. She had no property on which to conduct breeding and training, and hence the operation was farmed out to others. No stable name was established or maintained; stationery of her employer was utilized for her correspondence; and records of the operation were not kept except for canceled checks and some assorted bills. Jane professed to be breeding and training horses for sale, but only two horses were ever sold. There is no tangible indication in the record that real efforts were ever made to sell other horses, except for Jane's assertion that she hoped to sell the two sent to California to the Olympic Equestrian Team. Jane could not have been unfamiliar with methods of conducting a business venture such that its full potential would be realized. She was plant manager of the Company and familiar with business operations; yet, as the above facts indicate, she undertook the new venture as if a novice. We can only conclude that the manner and conduct of the horse activities belie a genuine intent to make a profit. While she may have intended *164 to sell some of her horses, we think this was only to defray the expenses of her hobby or to rid herself of horses which did not meet expectations. Her primary engagement was pursuing her life-long love and hobby of horses. We hold that petitioner has not met her burden of proof that she was engaged in a trade or business and hence her claimed deductions are disallowed. The only other issue in the instant case concerns whether petitioner has substantiated the amount of certain claimed charitable and theft loss deductions totaling $759.95 in 1966. She conceded at trial and respondent agreed that a claimed tax deduction was allowable to the extent of $297.25 in 1966. 897 Hence total deductions are claimed in the amount of $1,057.20. As indicated in the facts, Jane donated to various organizations three basset puppies, which she valued at $150 each. The burden to establish this as the fair market value for each is upon her, as required by section 1.170-1(c)(1), Income Tax Regs. Jane stated that the stud fee for a basset was $150 and each puppy was worth that *165 amount; however, we cannot accept this as sufficient without further supporting evidence. She was not an expert witness. The closest petitioner came to a probative fair market value estimation was her assertion that one of the puppies sold for $125. This is the maximum which we could allow as a value per puppy, or $375 total. Since this figure falls $75 short of what was claimed and reduces petitioner's total claimed deductions - charitable, taxes and casualty loss - to below $1,000, the total deductions would not exceed the section 141 standard deduction of $1,000 allowed by the statutory deficiency notice. We need not, therefore, decide whether petitioner has substantiated the value of her casualty loss. The standard deduction would still yield a greater deduction. Accordingly, we hold for respondent that petitioner has not proven deductions above $1,000 and hence is only entitled to the $1,000 standard deduction in 1966. Decision will be entered for the respondent. Footnotes
1. All statutory references are to the Internal Revenue Code of 1954.↩
2. SEC. 165. LOSSES (a) General Rule. - There shall be allowed as a deduction any loss sustained during the taxable year and not compensated for by insurance or otherwise. * * * (c) Limitation on Losses of Individuals. - In-the case of an individual, the deduction under subsection (a) shall be limited to - (1) losses incurred in a trade or business;↩