JAMES W. PETERSON AND ELLEN F. PETERSON, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Peterson v. Commissioner
Docket No. 38286-84.
United States Tax Court
T.C. Memo 1987-508; 1987 Tax Ct. Memo LEXIS 504; 54 T.C.M. (CCH) 808; T.C.M. (RIA) 87508; September 29, 1987. Debra L. Bowen, for the petitioners. Erin Collins, for the respondent. BUCKLEY
MEMORANDUM FINDINGS OF FACT AND OPINION BUCKLEY, Special Trial Judge: This case [1] was heard pursuant to section 7456(d) of the Internal Revenue Code (redesignated as section 7443A(b) by section 1556 of the Tax Reform *506 Act of 1986, Pub. L. 99-514, 100 Stat. 2755) and Rules 180, 181 and 183. [2]
Respondent determined a deficiency of $ 8,859.52 in petitioners' Federal income tax for 1981. The issues for consideration are: (1) whether petitioners, [3] vintage-vehicles operation and endurance horse breeding and training operation were activities "not engaged in for profit" within the meaning of section 183; (2) whether petitioners adequately substantiated deductions claimed in connection with the above activities; and (3) whether petitioners correctly determined their depreciation deductions for ranch property. *507 In an amendment to their petition, filed with leave of Court after trial petitioners claimed an overpayment based on deductions not claimed on their 1981 tax return for additional expenses incurred in connection with the ranch property. FINDINGS OF FACT Some of the facts have been stipulated and are found accordingly. The stipulation of facts, as orally supplemented at trial, and attached exhibits are incorporated herein by reference. At the time they filed their petition and amended petition, James and Ellen Peterson, husband and wife, resided in Mill Valley, California. They timely filed a joint return for the 1981 taxable year. During the year 1980 through 1984, James Peterson was employed as an insurance salesman, and Ellen Peterson was employed as a nurse-supervisor. Their employment earnings and other income for those years were as follows: Employment Earnings
Other Income
Total
1980
$ 88,895 $ 1,801 $ 90,696 1981
96,337   25,824  122,161  1982
112,440  13,201  125,641  1983
134,298  15,292  149,590  1984
178,700  13,083  191,783  During this same period, petitioner was engaged *508 in other activities for which he claimed deductions and reported losses on petitioners' joint tax returns for 1980 through 1984.
Vintage Vehicles
The first of these activities was listed as "sales" of "vintage vehicles" on Schedule C of petitioners' joint returns for 1980 through 1984. Petitioners reported expenses, income, and losses from this activity as follows: Expenses
Income
Losses
1980
$ 8,128
$ 5,800
$ 2,328
1981
5,986
200
5,786
1982
3,921
2,350
1,571
1983
-0- -0- -0- 1984
4,646
-0- 4,646
Petitioner had an interest in automobiles all his life. During the 1970's it appeared that changes in the automobile industry -- such as fuel consumption, pollution control, and safety requirements -- would result in a scarcity of certain types of cars, particularly those commonly referred to as "gas guzzlers" and "muscle cars." Motivated by these changes, as well as his longstanding interest, petitioner began the process of purchasing and restoring certain vehicles. During 1978 and 1979, he acquired a Mercedes Benz coupe, a 1933 Ford pickup truck, a 1974 De Tomaso Pantera, and a 1956 Lincoln Mark II Continental. His collection *509 also included a 1967 Austin-Healey which he "retired" from personal use. During 1980 petitioner sold the Pantera and the Lincoln Continental for amounts greater than his costs and sold the Mercedes at a loss of about $ 500 to $ 1,000. He purchased an Alfa Romeo for $ 1,500 and sold it 2 weeks later for $ 2,850. During 1980, he also purchased a 9165 AC Cobra for $ 28,500. After 5 years of operation, petitioner's inventory at the close of 1984 consisted of the Austin-Healey, the Ford pickup, and AC Cobra. [4]
Petitioner subscribed to the "Snakebite Bulletin," an advertising publication for Shelby Cobras, Mustangs, and other special-interest Ford cars, and to "Hemmings Motor News," an international advertising publication for antique, vintage, and special-interest automobiles. Petitioner relied on advertisements in these periodicals, as well as advertisements in his local newspaper, when assessing the value of his *510 vehicles. By 1985, petitioner had become interested in "remanufacturing" Jaguars. This process involves restoring the Jaguar body and coachwork and installing a Chevrolet engine and transmission. At the time of trial petitioner had completed or nearly completed a prototype Jaguar sedan. Petitioner did not consider himself an expert on special-interest vehicles. He was, however, very knowledgeable in the area. He was a member of the Shelby American Club, a club for people interested in Cobras. Petitioner became involved in a network of people who specialize in selling special-interest vehicles. Three auctions were held annually in California, and petitioner made a point of attending them. Through his publication subscriptions, the auctions, and networking, petitioner kept abreast of the market for vintage vehicles. Petitioner was not trained as a mechanic. He searched around and found one skilled and trustworthy mechanic who worked for him on a contract basis. For bodyshop restoration, petitioner traveled 100 miles to Sacramento to obtain quality work at a minimum price. Petitioner financed the automobile activity through short-term loans and with the income he *511 received from his full-time employment. He divided his free time between the vintage vehicle operation, which was centered at his Mill Valley home, and his ranch at Bolinas, which will be discussed later. During 1981, petitioner worked on and stored the Austin-Healey and the Cobra in the garage of his residence. The garage measured 25 feet by 10 feet and represented approximately 26 percent of the total square footage of the residence. The garage had electricity and heat but no air conditioning. Petitioner also maintained at his residence an office which contained a desk, file cabinet, telephone, and automobile manuals and publications. He made an average of six phone calls per week, both local and long distance, to discuss vintage vehicles. The office measured approximately 12 feet by 10 feet, which represented 4 percent of the total square footage of the residence. On petitioners' 1981 return, petitioner stated that he was not claiming a deduction for home office expense. Together, the office and garage represented approximately 31 percent of the total square footage of the residence. For the 1981 taxable year, petitioners claimed $ 5,986 in deductions in connection *512 with the vintage vehicles activity on their 1981 return. They reported $ 200 in income and claimed a net loss of $ 5,786. Respondent disallowed the loss deduction on the grounds that "the occasional sale of an item does not constitute an ongoing business" and that petitioners had not substantiated the deductions claimed. The parties arrived at a partial stipulation in regard to substantiation of some of the expenses claimed on their return for the vintage vehicles activity: insurance costs of $ 1,124 and repair costs of $ 1,970. Additionally, petitioners substantiated expenses of $ 2,022 which were not claimed on their return. Some of these expenses pertain to petitioners' Mill Valley residence as a whole. [5] Further, it was agreed that petitioners' basis in their Mill Valley home for purposes of depreciation, if allowable, was $ 65,000. *513 The Bolinas Ranch
In October 1979, petitioners purchased 4.71 acres of land in Bolinas, California (hereafter Bolinas Ranch or the ranch). Bolinas, while located only about 25 miles from San Francisco, can be described as a fairly rural area somewhat off the beaten path. These is easy access to Point Reyes National Seashore, Golden Gate National Recreation Area, and Mount Tamalpais State Park. The ranch contained a residence with carpets, drapes, and appliances; a barn; foaling sheds; a water storage tank; pump houses; an irrigation system; and other miscellaneous equipment. The purchase price for the property was $ 275,000. Settlement costs, including a $ 3,000 loan origination fee, amounted to $ 5,356.98. Petitioners rented the house on the ranch. The remaining land, less one acre which was swampy in nature, was used in connection with petitioner's horse operation. Petitioners treated the house rental and horse operation as one activity for tax purposes. They reported on Schedule F expenses, income and losses as follows: Expenses
Income
Losses
1980
$ 46,531
$ 17,000
$ 29,531
1981
45,517
13,600
32,115
1982
42,837
15,600
27,237
1983
42,775
6,500
36,275
1984
47,428
-0-  47,428
*514 Petitioner considered the location, topography and climate of Bolinas ideally suited to the breeding and training of horses for endurance racing. He hoped to attract persons to Bolinas for that purpose and further hoped that interest in the area would increase the value of the ranch. Petitioner owned and rode horses for pleasure for many years; he is the only member of his family who rides. During 1971 petitioner made the acquaintance of a woman whom he considered to be an expert in endurance riding and became interested in the sport. He purchased a mare from the woman as an endurance "prospect." The mare, a Mustang, was bred with an Arabian and that produced Moon, a filly foaled in 1976. In 1980, petitioner began his endurance horse operation by purchasing for $ 800 a half-Arabian filly named Giselle Baskello (Giselle), whose dam was an Appaloosa. Giselle was a year old when she was transferred to petitioner's possession on the ranch in June 1980. During 1981, petitioner owned two mares, Moon and Giselle, and a third horse was born on the ranch. Aside from Moon and Giselle, petitioner had another horse for recreational riding. In 1985, Moon was 9 years of age and Giselle *515 was 6. Neither mare had been bred, although petitioner arranged to have Moon bred in the spring of 1986. Neither mare had been shown or raced. Petitioner planned to start campaigning Giselle in 1986. She was "somewhat of a slow developer mentally" and was not ready to be campaigned in 1985. Endurance racing is a form of competitive long distance riding which requires covering a distance of 25 to 200 miles at a time. The trails are often precarious, containing, for example, bridges without railings. There is no established breed of endurance horse, and one can only acquire an endurance "prospect." Such a prospect must possess qualities of speed, strength, stamina, and calm disposition. One of petitioner's goals in commencing his breeding and training activity was to create a new breed of horse that would combine the stamina and endurance of the Arabian with the strength and common sense of other breeds, such as the Appaloosa. Petitioner peformed several of the chores connected with the operation, such as fence repair. Petitioners themselves undertook minor veterinarian work on the horses, and petitioner did some of the grooming and exercising. After saddle-breaking the horses *516 himself, petitioner turned them over to a woman who had been training horses in the area since approximately 1970. Petitioner did not have the expertise or the time to train the horses properly. He learned by working with his horse trainer. Because of his full-time insurance occupation he had to divide his free time on weekends between his vintage-vehicle operation and his ranch activities. Aside from the trainer, petitioner was acquainted with two women who were recognized within the "horse community" as skilled endurance riders. Petitioner financed his breeding and training activity with his income from the insurance business. The activity produced no income during the years 1980 and 1984. Respondent disallowed the deductions relating to the horse breeding and training activity on the grounds that the activity was not engaged in for profit and because petitioners did not establish that the amounts claimed represented losses sustained by them. Petitioners have substantiated almost all of the expenditures disallowed by respondent in regard to the horse operation. [6]
*517 Additionally, on their Schedule C for 1981 petitioners claimed a deduction for the cost of airfare to pick up a 1956 Ford pickup truck which was used in connection with the horse operation rather than the vintage vehicles activity. Petitioner flew in October of 1981 to Inuyo, California, at a cost of $ 359 to purchase the truck. He claimed, but did not prove, that he paid $ 5,000 for it and on the return claimed depreciation of $ 1,250 and an investment tax credit of $ 500.
The Bolinas House
Petitioners rented the Bolinas house. It was a 3-bedroom, 1-1/2 story combination ranch/coastal style house with attached garage. The house measured approximately 2,200 square feet, had a wood-siding exterior and all cedar interior. Among the amounts disallowed by respondent was $ 93 expended in advertising the house for rent. This amount is deductible. Petitioners claimed depreciating deductions on the house and its furnishings and appliances, the barns and outbuildings, farm and other equipment, and on the filly, Giselle, for a total of $ 10,031. Respondent disallowed the depreciation deductions in total on the grounds that petitioners did not establish the cost or other basis *518 in the assets or that they were depreciable in nature. Petitioners have proven the basic cost of the ranch as a whole at $ 275,000. They were unable to show any breakdown of the purchase price between the house, its various furnishings and appliances, and the ranch outbuildings and equipment. The only possible assistance to the Court in this regard, except for petitioner's vague and unsubstantiated statements of opinion, consists of the 1981 real property tax bill which indicates a value to the land of $ 112,000 and to the improvements of $ 158,100. Thus, of the total cost we allocate 58.5 percent to the house and other improvements, and 41.5 percent to the land. In addition to the amounts claimed by petitioners on their return in connection with the house rental, petitioners have substantiated additional utility costs of $ 298, which amount is deductible. Petitioners incurred various costs (but did not substantiate payment) for repairs and improvements totaling $ 4,370.09. Further, petitioners contend they failed to claim two installments of $ 1,524.49 each for real property taxes on the Bolinas ranch, one due on December 10, 1981, the other on April 10, 1982. Petitioner's *519 only substantiated payment of either installment in 1981 was through his uncorroborated testimony in which he stated he paid both installments prior to the due date of December 10, 1981. We believe he paid the December 10, 1981, installment of $ 1,524.49 during 1981 and we so find. Petitioner did not maintain books and records for his automobile activities, horse activities and Bolinas ranch rental separate from his personal books and records. Petitioner kept his books and records in the office at his residence in Mill Valley. In 1982 the residence suffered severe storm damage so that many items had to be placed in storage during the repair period. Petitioner's testimony was that he had difficulty finding many canceled checks. He did not, however, testify as to any attempt to secure copies of the canceled checks from his banks prior to the issuance of the notice of deficiency in October of 1984 or at any time thereafter up to and including the date of trial. OPINION
Vintage Vehicles and Bolinas Ranch Activities
The first question presented is whether petitioners are entitled to deduct the expenses attributable to the vintage vehicles and endurance horse activities. *520 Petitioners must prove that the expenses are properly deductible under either section 162 or 212. Welch v. Helvering,290 U.S. 111 (1933); Rule 142(a). For such expenses to be allowed as a deduction under either section, petitioners must establish that each of the activities was engaged in for profit. Boyer v. Commissioner,69 T.C. 521, 536 (1977); Benz v. Commissioner,63 T.C. 375, 382 (1974). Whether an activity is engaged in for profit turns on whether the taxpayer has a bona fide objective of making a profit. Dreicer v. Commissioner,78 T.C. 642, 643 (1982), affd. without opinion 702 F.2d 1205 (D.C. Cir. 1983); Engdahl v. Commissioner,72 T.C. 659, 666 (1979); Golanty v. Commissioner,72 T.C. 411, 425-426 (1979), affd. in an unpublished opinion 647 F.2d 170 (9th Cir. 1981). The taxpayer's objective is a question of fact to be determined from all the facts *521 and circumstances. Allen v. Commissioner,72 T.C. 28, 34 (1979). The burden of proof is on the taxpayer, Golanty v. Commissioner, supra at 426, with greater weight given to objective facts than to the taxpayer's mere statements of intent. Engdahl v. Commissioner, supra at 666; sec. 1.183-2(a), Income Tax Regs.
The regulations promulgated under section 183 set forth some of the profit-motive requirements of sections 162 and 212, and courts have considered the factors contained in section 1.183-2(b), Income Tax Regs., in making the requisite profit-motive analysis under these sections. Brannen v. Commissioner,722 F.2d 695, 704 (11th Cir. 1984), affg. 78 T.C. 471 (1982). Section 1.183-2(b), Income Tax Regs., lists the following nine factors which should normally be taken into account in determining whether an activity is engaged in for profit: (1) the manner in which the taxpayer carries on the activity; (2) the expertise *522 of the taxpayer or his advisors; (3) the time and effort expended by the taxpayer in carrying on the activity; (4) the expectation that the assets used in the activity may appreciate in value; (5) the success of the taxpayer in carrying on other similar or dissimilar activities; (6) the taxpayer's history of income or losses with respect to the activity; (7) the amount of occasional profits, if any, that are earned; (8) the financial status of the taxpayer; and (9) the elements of personal pleasure or recreation involved in the activity. These factors are not exclusive and are to be applied according to the unique facts of each case. Sec. 1.183-2(b), Income Tax Regs. Accordingly, no one factor, nor a majority of the nine factors, need to be considered determinative. Golanty v. Commissioner, supra at 426-427. Our determination must be based upon the record as a whole. A review of the entire record in this case persuades us that petitioner has failed in his burden of proving that either his vintage vehicles activity or his endurance horse operation *523 was engaged in for profit. The "evidence" petitioner relies on in support of his position is based almost entirely on his speculation and self-serving statements of intent. With this in mind, we first address petitioner's arguments peculiar to the vintage vehicles operation. We have little objective evidence in this regard. We heard petitioner testify that he commenced this activity with the purpose of purchasing, maintaining, and restoring special-interest vehicles and holding them for resale at appreciated prices. He stated that his goal was to build up his inventory -- trading as he went along -- to a stock of about $ 400,000 to $ 500,000 by 1990 at which time he would retire from the insurance business, hire employees, and open a downtown facility to cater to the walk-in trade rather than depend on word-of-mouth referrals. He went on to testify that he has a business planner who projected a gross margin of profit of about $ 24,00 in 1986 and that taking into account the overhead expenses of maintaining a facility and inventory, this would build to a conservatively estimated net profit by 1990 of $ 72,000. However, he failed to offer into evidence any plans, expert opinions *524 or documents which would tend to prove objectively these facts, and we are left with petitioner's mere statements of intent. We believe these statements carry little weight, Engdahl v. Commissioner, supra at 666, in light of petitioner's history of losses from 1980 through 1984 and his low level of buying and selling activity since the end of 1980. The record indicates that petitioner acquired and sold four vehicles during 1978 through 1980.[7] From 1981 through 1985, petitioner's "activity" consisted of ownership of three vehicles -- one of which was the Austin-Healey which had been his personal automobile -- with the addition in 1985 of the Jaguar. The mere fact that petitioner owned several vehicles which might or might not appreciate in value over time does not sustain petitioner's contention that he engaged in the activity for profit. [8] See Jasionowski v. Commissioner,66 T.C. 312, 323 (1976). *525 Petitioner made efforts to locate a skilled and trustworthy mechanic and traveled 100 miles to Sacramento to obtain the best bodyshop restoration at a minimum price. Petitioner contends this supports his profit-motive objective because it shows he attempted to minimize repair costs. An attempt to minimize makes financial common sense but it does not prove profit motivation. In fact, petitioner's constant losses should, in and of themselves, serve to induce a prudent person to reduce costs, especially in a case such as this where it is evident that there has been a constant negative cash flow. Petitioner did not maintain separate books and records, a separate bank account or other bookkeeping information. Rather, he paid the costs connected with the automobile activity out of his personal checking accounts. We find that petitioner did not engage in the activity of acquiring, holding and selling vintage automobiles with an objective of profit. He enjoyed old automobiles, he took pleasure in acquiring, holding and selling them, but he did not do it with a bona fide objective of profit. Several characteristics of petitioner's vintage vehicles operation have much in common with *526 his endurance horse activity to which we now turn. Here, too, our determination is whether petitioner engaged in this activity with a bona fide objective of profit. The facts and legal arguments advanced by both parties in regard to petitioner's Bolinas ranch activities were poorly developed in the record, leaving us unclear as to several aspects of the issue. What is clear is that petitioners treated the rental of the property and the horse activity as a single enterprise engaged in for profit, and respondent determined that the endurance horse operation was a separate activity not engaged in for profit within the meaning of section 183. As a preliminary matter, therefore, in regard to Bolinas, we must ascertain whether petitioners were engaged in one or two separate activities. Sec. 1.183-1(d)(1), Income Tax Regs.
Petitioner had a twofold purpose in acquiring the ranch: (1) to hold the property for rental and later resale, counting on its natural beauty and location to generate appreciation in value; and (2) to establish an endurance horse breeding and training facility. Petitioner hoped that San Francisco area residents might become interested *527 in acquiring horse property in the Bolinas area if they became familiar with his horse activities. He viewed the horse breeding and training facility as a marketing method of getting people to visit the area so they could recognize its value for horseback riding. Thus, he hoped to counteract certain publicity about Bolinas which suggested that area residents were not friendly to newcomers. We do not find the relationship between the endurance horse operation and the rental of the residence sufficiently interrelated to hold that they constitute one activity. Section 1.183-1(d)(1), Income Tax Reg., provides: where the taxpayer is engaged in several undertakings, each of these may be a separate activity, or several undertakings may constitute one activity. In ascertaining the activity or activities of the taxpayer, all of the facts and circumstances of the case must be taken into account. Generally, the most significant factors and circumstances in making this determination are the degree of organizational and economic interrelationship of various undertakings, *528 the business purpose which is (or might be) served by carrying on the various undertakings separately or together in a trade or business or in an investment setting, and the similarity of various undertakings. Generally, the Commissioner will accept the characterization by the taxpayer of several undertakings either as a single activity or as separate activities. The taxpayer's characterization will not be accepted, however, when it appears that his characterization is artificial and cannot be reasonably supported under the facts and circumstances of the case. In light of the above criteria, and considering all the facts and circumstances of the case, we must conclude that the rental of the residence and the endurance horse operation were two separate and distinct activities. Petitioner did not assert, nor do we find that he viewed the endurance horse activity as a marketing method of attracting tenants or increasing rental payments for the residence, or vice versa. Petitioner presented no evidence whatsoever that any nexus existed between the two activities. He directed us to no business reason to support his characterization of the two activities as one integrated enterprise. *529 The undertakings possessed no similarities, aside from the fact that both were located on the same tract of land. Neither activity promoted or enhanced the other. Moreover, the record is devoid of any indication of an organizational or economic interrelationship between the rental of the residence and the endurance horse activity. with regard to the relationship between petitioner's holding the rancher for resale and his endurance horse operation, the regulations provide: Where land is purchased or held primarily with the intent to profit from increase in its value, and the taxpayer also engages in farming on such land, the farming and the holding of the land will ordinarily be considered a single activity only if the farming activity reduces the net cost of carrying the land for its appreciation in value. Thus, the farming and holding of the land will be considered a single activity only if the income derived from farming exceeds the deductions attributable to the farming activity which are not directly attributable to the holding of the land (that is, deductions other than those directly *530 attributable to the holding of the land such as interest on a mortgage secured by the land, annual property taxes attributable to the land and improvements, and depreciation of improvements to the land). [Sec. 1.182-1(d)(1), Income Tax Regs.] [9]
We note that during 5 years of operation, the endurance horse activity produced no income. It did not serve to reduce the total carrying costs of owning the land. Quite to the contrary, petitioner made improvements which related to the horse operation. We therefore conclude that the endurance horse operation constituted a separate activity for purposes of applying section 183. Moreover, we find that the endurance horse operation had no economic interrelationship with the holding of the ranch for rental or appreciation, despite petitioner's characterization *531 of the operation as a marketing method to increase the value of the property. His testimony in this regard consisted of his opinion and his statements of intent, neither of which are supported by the facts of the case. Petitioner rented the Bolinas house for the production of income. We now turn to the question of whether the endurance horse breeding and training operation, in and of itself, was an activity engaged in for profit. [10]
*532 To begin with, it is clear that the activity of breeding, raising, and showing horses for sale may constitute an activity engaged in for profit. Commissioner v. Widener,33 F.2d 833 (3d Cir. 1929), affg. 8 B.T.A. 651 (1927). Moreover, as we stated in Besseneyey v. Commissioner,45 T.C. 261, 274 (1965), affd. 379 F.2d 252 (2d Cir. 1967), cert. denied 389 U.S. 931 (1967) -- The presence of losses in the formative years of a business, particularly one involving the breeding of horses, is not inconsistent with an intention to achieve a later profitable level of operation, bearing in mind, however, that the goal must be to realize a profit on the entire operation, which presupposes not only future net earnings to recoup the losses which have meanwhile been sustained in the intervening years. Petitioner testified that he had a business plan which projected profits for the activity "somewhere before 10 years," considering that he took possession of Giselle in 1980 when she was a year old and that she could not race before the age of 6. Petitioner did not offer his business plan into evidence. In fact, *533 petitioner failed to produce any evidence indicating that this activity would ever become profitable or that he in fact had a bona fide objective of profit. We note the following factors which we considered in arriving at our determination that petitioner did not have an objective of profit in regard to the endurance horse operation. First, petitioner did not carry on this activity in a businesslike manner. He did not keep accurate, separate books or records. He presented no business license, business cards, stationery, receipts, or any other indicia of a business. Although many of the petitioner's canceled checks for 1981 were either misplaced, lost, or destroyed in the 1982 storm which damaged his Mill Valley residence, petitioner did not claim that any other types of records ever existed. Petitioners had several checking accounts, not one of which was used exclusively for the operation. Instead, personal funds and expenses were commingled. Second, petitioner offered no probative evidence that he had prepared for horse breeding and racing by studying accepted business or economic practices. He demonstrated a degree of knowledge which would be typical of any person with *534 a longstanding interest in horseback riding, but he had no real business expertise. Moreover, he failed to prove, either with documentation or witnesses, that he in fact sought professional advice from people who were established as experts, the substance of the advice obtained, and whether or not he conducted his activities in accordance with such advice. Petitioner was employed full-time in the insurance business and derived substantial earnings therefrom. His employment afforded him the income to engage in both the vintage vehicles and endurance horse activities, but it did not afford him the time to expend much effort toward making them profitable. Neither activity showed a profit during 5 years of operation. Petitioner's spare time was divided between both activities, and both activities had substantial personal and recreational aspects. We are convinced that petitioner derived a great deal of personal pleasure from owning and working with special-interest vehicles and horses and from associating with others with similar interests. While it is clear that elements of personal pleasure or recreation in an activity are not sufficient themselves to establish a lack of profit *535 objective, section 1.183-2(b)(9), Income Tax Regs., we find that petitioner's personal enjoyment of both pursuits was the motivating factor in undertaking both endeavors, and that he did not engage in these activities with a bona fide objective of making a profit. Dreicer v. Commissioner,78 T.C. 642 (1982), affd. without opinion 702 F.2d 1205 (D.C. Cir. 1983). Section 183(c) defines an activity not engaged in for profit as "any activity other than one with respect to which deductions are allowable for the taxable year under section 162 or under paragraph (1) or (2) of section 212." Section 182(a) provides in pertinent part that if an individual engages in an activity, and "if such activity is not engaged in for profit, no deduction attributable to such activity shall be allowed under this chapter except as provided in this section." Section 183(b)(1) *536 provides that only those deductions allowable regardless of a profit objective (such as interest or taxes) may be taken. Additionally, section 183(b)(2) provides that other deductions which would be allowable if the activity were engaged in for profit shall be allowed "but only to the extent that the gross income derived from such activity for the taxable year exceeds the deductions allowable by reason of paragraph (1)." The endurance horse breeding and training operation produced no gross income during 1981. Therefore, petitioners are not entitled to any deductions for this activity, including the depreciation claimed for Giselle. [11]
*537 Petitioner's 1981 gross income from his vintage vehicles activity amount to $ 200. Therefore, petitioners are only entitled to deduct expenses relating to the activity to the extent that $ 200 exceeds the deductions allowable under section 183(b)(1). The parties have stipulated that petitioners have substantiated several claimed deductions as set forth in our findings of fact. These will be deductible only to the extent allowable under section 183(b)(2). We need not discuss items claimed by petitioner individually since the substantiated deductions are far in excess of the statutory limitations. Suffice it to say that petitioner completely failed to prove that he had paid any of the disallowed items from his Schedule C automobile activity other than those stipulated.
Bolinas House Rental
There are also some questions to be resolved regarding the proper deductions on the rental of the Bolinas house. In the statutory notice of deficiency respondent disallowed all of petitioners' claimed depreciation deductions for Bolinas on the grounds that petitioners did not establish their cost or other basis in the assets or that they were depreciable. The parties have now stipulated *538 that petitioners purchased the property for $ 275,000. The purchase price included the house, carpeting, drapes, some appliances and all of the outbuildings, fencing and so forth. Petitioner has failed to prove that there was any breakdown in the purchase price of these various components. Further, he has failed to prove any reasonable allocation between the cost of the outbuildings and the house, or between the house and its furnishings. Clearly, petitioners are entitled to the deduction of some depreciation but the question we must determine is depreciation upon which items and their adjusted cost basis. First, we allocate the purchase price of $ 275,000 between land and improvements. The only credible evidence available is the property tax statement, not for the year of purchase, 1979, but for July 1981. Accepting at face value petitioner's assertion at trial that property values in that area have been static, we will use the same percentage breakdown between land and improvements as utilized by the assessor's office. Thus, we allocate 58.5 percent to the improvements and 41.5 percent to the land, or $ 114,000 to land [12] and $ 161,000 to improvements. *539 Next, we must arrive at a breakdown of the $ 161,000 between the house, its furnishings and the outbuildings. This is a necessity since it is clear from the record that petitioners did not rent the outbuildings on the property but rather utilized them for the horse operation. The depreciation on them does not, therefore, represent an item which it is necessary for us to determine since any deductions may be taken only from income (of which there was none) from the horse operation. Petitioners computed depreciation on the component method. However, for purposes of depreciating used real property improvements, the component method can be used only if the cost of acquisition was allocated among the various components proportionately with their relative values, and the useful lives of the components were correctly determined at the time of acquisition. See Fieland v. Commissioner,73 T.C. 743, 752 (1980), and cases cited therein. Petitioners failed to do this and the burden is on petitioners to sustain their claimed deductions. New Colonial Ice Co. v. Helvering,292 U.S. 435 (1934); *540 Welch v. Helvering,290 U.S. 111 (1933). Based upon the meager record presented by petitioners, we can do little more than make an estimate, bearing heavily upon petitioners whose duty and burden it was to support their depreciation deduction. Cohan v. Commissioner,39 F.2d 540 (2d Cir. 1930). Accordingly, our best estimate is that of the $ 161,000 of the purchase price we have allocated to the improvements, $ 125,000 pertains to the house and its furnishings and the balance to the outbuildings. Petitioners, unfortunately, have not provided us with any basis whatesoever upon which we can make an allocation of this $ 125,000 between the cost of the house and the cost of the furnishings. Accordingly, we decline to make a guess [13] in this regard and direct that this full amount shall be depreciated based upon a thirty-year useful life. See Lysek v. Commissioner,583 F.2d 1088, 1093, 1094 (9th Cir. 1978), affg. T.C. Memo. 1975-293. *541 Miscellaneous
The loan origination fee of $ 3,000 incurred by petitioners on the purchase of the Bolinas property is amortizable over the life of the loan. Petitioner failed to prove that he paid any repair expenses on the Bolinas property during 1981, except for $ 1,400. Further, he failed to show whether such expenses related to the rental of the house or the endurance horse activity. Therefore, no such amounts are deductible. Finally, petitioners are entitled to an additional deduction for real property taxes paid during 1981 of $ 1,524.49. Because of the foregoing and concessions by respondent, Decision will be entered under Rule 155.
Footnotes
1. This case was originally filed as a small tax case as provided for in section 7463. Counsel for petitioners moved the Court to remove the case from the small case category and by order the Court granted the motion. ↩
2. Unless otherwise indicated, section references are to the Internal Revenue Code of 1954, as amended and in effect during the year in issue, and Rule references are to the Tax Court Rules of Practice and Procedure. ↩
3. Since it appears that Ellen Peterson did not participate in the activities whose tax consequences are in issue in this case, and as she did not testify at trial, for convenience "petitioner" hereafter refers to James Peterson. ↩
4. At trial, petitioners' counsel consistently referred to the vintage-vehicles operation as "James W. Peterson Auto Traders." We note that there is no indication in the record that the activity had ever been given a formal name prior to the trial of the case. ↩
5. These consist of telephone $ 555 and utilities $ 1,080. Petitioners claim 31 to 34 percent of these expenses relate to the vintage vehicles activity. The remaining expenses, fuel $ 337 (of which $ 190 was claimed on the return) and Department of Motor Vehicles fees $ 50, pertain solely to the activity. Respondent has conceded the deductibility of the latter expense.↩
6. Thus, petitioners substantiated the following: pasture rent $ 365, feed $ 620, supplies $ 281, and horseshoeing $ 90. ↩
7. Petitioner's total activity in this regard from 1978 to trial date consists of the acquisition and sale of a Mercedes-Benz coupe, a 1974 De Tomaso Pantera, a 1956 Lincoln Mark II continental and an Alfa Romeo. Petitioner had on hand at the date of trial the 1967 Austin-Healey, the 1933 Ford pickup, the AC Cobra and the Jaguar. ↩
8. Petitioner placed an advertisement in "Hemmings Motor News" to the effect that he was looking for a particular Austin-Healey model. He received a response but concluded that the asking price was too high. Counsel would have us believe that this supports petitioner's profit-motive objective by evidencing his endeavor to "purchase low and sell high." We detect no such probative correlation. ↩
9. See Boddy v. Commissioner,T.C. Memo. 1984-156, affd. without published opinion 756 F.2d 884 (11th Cir. 1985), and Estate of Power v. Commissioner,T.C. Memo. 1983-552, affd. 736 F.2d 826↩ (1st Cir. 1984), wherein we applied this regulation to horse breeding and showing activities. 10. Although respondent's regulations deal specifically with the separate-versus-single activity issue where land is "purchased or held primarily with the intent of profit from increase in its value, and the taxpayer also engages in farming" and, in this context requires the farming operation to stand on its own feet ( sec. 1.183-1(d)(1), Income Tax Regs.), the regulations do not deal specifically with the situation where the appreciation element is involved in determining the profit objecctive for a farming operation. Keelty v. Commissioner,T.C. Memo. 1984-173. Where the decided cases have suggested that the single-activity concept applies in the latter situation they have taken the anticipated profit from the appreciation of the property into account only as one of several elements in deciding whether the requisite profit motive exits. See, e.g., Engdahl v. Commissioner,72 T.C. 659, 668 n. 4 (1979); Fields v. Commissioner,T.C. Memo. 1981-550. We have also taken this factor into account, section 1.183-2(b)(4), Income Tax Regs., and conclude that petitioner had at best "but a vague and unauthenticated notion" that his land would appreciate in value. LaMusga v. Commissioner,T.C. Memo. 1982-742↩. He stated at one point that land values in the Bolinas area had not changed much in 5 years. 11. Petitioner failed to prove his basis in the 1956 Ford pckup truck which he used in the horse operation. We will not make an effort to estimate such a basis for purposes of depreciation since it would not, in any event, be deductible. Neither, of course, is he entitled to the investment tax credit under section 38 and related sections. Elliott v. Commissioner,84 T.C. 227 (1985), affd. by unpublished opinion 782 F.2d 1027↩ (3d Cir. 1986). The claimed travel expense of $ 359 to pick up the truck is not deductible; at most it becomes part of petitioner's cost basis in the truck. 12. Petitioners argued that about an acre of their land was swampy and therefore not usable. From this and from their completely unverified opinion testimony they would have this Court hold that the value of their land was somewhat less than $ 10,000 per acre. We find petitioners' argument completely unconvincing. ↩
13. It is apparent that the appliances, carpets, drapes and furnishings had some value at the time of purchase. Although we were willing to utilize the principle of the Cohan v. Commissioner,39 F.2d 540 (2d Cir. 1930), rule, in determining the allocation between the house and the outbuildings, we are not willing to take the next step to allocate between the cost of the house and its furnishings in view of the complete lack of any evidence in this regard in the record. As stated in Williams v. United States,245 F.2d 559, 560 (5th cir. 1957), Cohan requires that -- there be sufficient evidence to satisfy the trier that at least the amount allowed in the estimate was in fact spent or incurred for the stated purpose. Until the trier has that assurance from the record, relief to the taxpayer would be unguided largesse. [Emphasis in original.]
Accord Vanicek v. Commissioner,85 T.C. 731↩ (1985).